## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 24 2015, 9:10 am
CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANTS

Thomas G. Krochta
Vanderburgh County Public Defender
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In the Matter of the Termination of the Parent-Child Relationship of T.K., Mother, J.W.R., Father, and K.R., J.R., and N.K., Children:

T.K. and J.W.R.,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 24, 2015

Court of Appeals Case No.
82A04-1501-JT-29

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Trial Court Cause Nos.
82D01-1406-JT-62
82D01-1406-JT-63
82D01-1406-JT-64

**Kirsch, Judge.**

[1] T.K. ("Mother") and J.W.R. ("Father") (together, "Parents") appeal the juvenile court's order terminating their parental rights to their children, K.R., J.R., and N.K. Parents raise the following restated issue on appeal: whether sufficient evidence was presented to support the termination of Parents' parental rights.

[2] We affirm.

## Facts and Procedural History

[3] N.K. was born on June 8, 2006, J.R. was born on March 31, 2008, and K.R. was born on October 4, 2012. N.K., J.R., and K.R. (collectively, "the Children") are all biological children of Mother, and Father is the biological father of J.R. and K.R.; Father is not the biological father of N.K.[1] N.K. and J.R. have previously been subject to prior interactions with the Indiana Department of Child Services ("DCS"). On August 12, 2009, DCS filed a Child in Need of Services ("CHINS") petition alleging that N.K. and J.R. were CHINS due to unsanitary conditions in the home and hygiene issues. The juvenile court adjudicated N.K. and J.R. to be CHINS, and ordered Parents to participate in services. On March 5, 2010, the CHINS case was closed. In February 2011, DCS had contact with family due again to unsanitary

---

[1] N.K.'s biological father is not a party to this case, and a fact finding as to the termination of his parental rights was to be held separately.

conditions in the home and because of an allegation of sexual abuse concerning N.K. The Children were removed because the home was found to be an unsafe environment for them. The Children were again adjudicated CHINS, and Parents were ordered to participate in services. The CHINS case was closed on November 18, 2011.

[4] Parents began participating in Community Partners with family counselor Lewis Wilson on January 18, 2013. Community Partners is a volunteer-basis program to which people are referred in order to achieve certain goals. In the Parents' situation, their housing environment was poor, and they needed to work on parenting and community resourcing. Wilson took Mother to apply for housing at several places, but she was not successful in securing anything. Wilson did not recall taking the Parents to secure employment, and he understood that, due to the Parents' circumstances, they were not looking for employment. Due to their lack of income, Parents had to focus only on free or subsidized housing. Community Partners stopped services with Parents on September 10, 2013 due to the current CHINS case being filed.

[5] On September 9, 2013, DCS filed a CHINS petition concerning the Children. The petition alleged poor hygiene of the Children, dirty living conditions, and allegations of domestic violence between Parents, which endangered the Children's physical and mental condition. There had been a report of one of the Children being found outside the home at midnight, and Parents not being able to be located for several minutes. A family case manager ("FCM") who went to the home after this report found the home to be very dirty with dishes

piled in the sink, a musty smell in the home, and a chemical smell in the home consistent with bug spray. Roaches were seen in the house, and the Children were dirty and wearing dirty clothing. The baby's bed and pillow were stained, and formula could not be found in the home. It had also been reported by the Children that there was a lot of arguing and fighting, consisting of pushing and hitting, between Parents. On September 5, 2013, one of the Children was also found to have a burn from a cigarette that had been flicked on him.

[6] The Children were removed from the home in early September 2013. On September 10, 2013, Parents stipulated, and the juvenile court adjudicated, the Children to be CHINS. A dispositional hearing was held, and Parents were ordered to participate in services including: (1) maintain contact with the FCM and notify of changes in contact information, household composition, or criminal charges; (2) allow FCM to make unannounced visits; (3) enroll in any recommended programs; (4) maintain stable housing and employment; (5) complete a parenting assessment and all recommendations; and (6) attend all scheduled visitations and comply with the rules and procedures set forth. On June 11, 2014, DCS filed a petition to terminate the parental rights of Parents. Termination hearings were held on September 9, 2014 and October 23, 2014, in which evidence was heard.

[7] During the hearing, the following testimony and evidence was presented. At the time of the hearing, Mother stated that Parents had been staying at Woodcreek Inn & Suites off and on for "two months or so." *Tr.* at 30. Before that, they had been "on the street for about a week or so" and staying with

friends when it was "too cold to be on the streets." *Id*. Since September 5, 2013, Parents had been homeless and living on the streets twice and had been homeless and living with friends twice. Starting in May 2014, and for approximately a month and a half, Mother lived in a homeless shelter while Father lived with his uncle. Parents had previously lived in several apartments, but had been evicted from them all, including: a house where they lived for approximately one year; another house where they resided for about thirteen to fourteen months; and an apartment where they lived for approximately eleven months. At the time of the hearing, Parents owed over $1,000 in court costs from one of the evictions. Father also owed some money for an electric bill from one of the houses.

[8] Parents had trouble maintaining stable housing and appropriate housing. In January 2013, Parents were living in a two-room apartment with one other adult and five children. They moved to a slightly larger house, but the home was infested with cockroaches. A service provider who visited the home had to bring cockroach spray and spray around her chair when she went to the home. In January, the home where Parents were residing became infested with bedbugs. Due to this infestation, visitation with the Children was suspended until Parents were able to obtain housing that was free from bedbugs. However, Parents were unable to do so.

[9] Additionally, evidence was presented that Parents never completed high school or obtained a GED. Both Parents dropped out of high school in the ninth grade, and although Father had tried numerous timed to obtain his GED, he

had not been successful. At the time of the termination hearing, Mother had been employed for only a few days through a temporary employment agency. She had previously been employed through another employment agency. Mother had also previously been employed by Hardees, but was let go because she was involved in an altercation with another employee. At the time of the hearing, Father had begun working approximately forty hours a week for a janitorial company through a temporary employment service and had been working at that job for a couple of weeks. Father had previously been employed from March 2014 to the end of April 2014 through an employment agency. Prior to that, Father had worked in 2008 and 2009 until he was laid off. Father also had been "scrapping" and trying to get on disability. *Tr.* at 76. He testified that he has trouble holding employment because he gets bored.

[10] During the pendency of this case, DCS referred Parents for supervised visitation with the Children. Prior to the commencement of visitation, Parents participated in four home sessions to learn parenting skills to implement during the visitations. Parents participated in thirteen supervised visitations with the Children at the DCS office and did well during the visits. However, they did not show the ability to put into practice what they had learned without someone supervising them. Parents never had any unsupervised visitation with the Children due to their failure to secure appropriate housing and stable employment.

[11] At the time of the termination hearing, the Children had been removed from the home since September 5, 2013. The court appointed special advocate

("CASA") testified that the Children were doing well in their placement and enjoying school. The Children's behaviors had become less chaotic and more settled. The Children had done better since contact with Parents was suspended. Nightmares that the Children were experiencing had stopped, and other concerning behaviors of the Children had improved. Both the CASA and the FCM stated that they believed that termination of the Parents' parental rights was in the best interests of the Children. The FCM also stated that the Children were "adoptable" and needed a "forever home" that would "give them what they need and what they deserve, which is [a] clean home, clean clothes, [to] always have dinner, [and to] always be loved." *Tr.* at 158. DCS's plan for the Children was adoption.

[12] On December 17, 2014, the juvenile court issued its findings of fact, conclusions, and order terminating Parents' parental rights to the Children. Parents now appeal.

## Discussion and Decision

[13] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.*

Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[14] Here, in terminating Parents' parental rights to the Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[15] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[16] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[17] Parents argue that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, they contend that DCS failed to present

sufficient evidence that the conditions that resulted in the Children being removed would not be remedied. Parents also argue that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to the Children. They further allege that DCS failed to present sufficient evidence that termination of their parental rights was in the best interests of the Children. Parents assert that, although housing, money, and cleanliness have been issues throughout the case, the evidence showed that Father had a job at the time of the hearing, and his prospects for stable employment were good, which would resolve these issues.

[18] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id*. Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against " 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has

discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id*. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id*.

[19] Here, the evidence showed that the Children were originally removed from the home due to several reports of inappropriate and unsafe living conditions for the Children and a report of one of the Children being burned by a cigarette that had been flicked on him. The Children were later adjudicated as CHINS based on their poor hygiene, the dirty home, and reports of domestic violence in the home. The Children continued to be placed outside of the home because Parents failed to benefit from the services offered by DCS, were unable to maintain stable housing and employment, were not able to resume visitations with the Children after the visits were suspended due to the Parents' apartment being infested with bedbugs, and often lived in places where the living conditions were unsafe for the Children.

[20] At the time of the termination hearing, Parents' housing situation was worse than at the time the Children were removed. For the two months preceding the hearing, Parents had been living off and on in a hotel. At one point during the pendency of the case, Mother was living in a homeless shelter, and Father was living with a relative. Parents also had been homeless four different times since the Children had been removed, living on the streets or with friends. Additionally, although Father had found employment at the time of the hearing, there was evidence that Father's employment had not been stable

throughout the case as he had difficulty maintaining employment. Mother had been employed very little during the course of the case, and at the time of the hearing, she had only been employed for a couple of days. Further, Parents failed to participate in services and in visitations with the Children. They only attended four training sessions and thirteen visitations. After the visitations were suspended due to the bedbug infestation at the Parents' apartment, they never resumed. Parents were also never able to have unsupervised visitations with the Children due to their lack of appropriate housing. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of the Children outside the home would not be remedied.

[21] Parents also contend that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Children. However, we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of the Children would not be remedied, we will not address any argument as to

whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of the Children.

[22]     Parents next argue that insufficient evidence was presented to prove that termination is in the best interest of the Children. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[23]     Here, the evidence presented showed that, since 2009, Parents have been involved with DCS concerning their difficulty in providing the Children with appropriate, safe, and stable housing. At the time of the hearing, Parents had still not been able to obtain stable housing as they had been staying in a hotel off and on for the previous two months, and before that, they had been

homeless, living on the streets or with friends. Further, the homes where Parents have lived have been dirty, crowded, and infested with bedbugs or cockroaches. N.K. and J.R. had been subjected to this instability in housing, poor hygiene, and unsanitary conditions since the Parents' first interaction with DCS in 2009. The Children deserve permanency and stability. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. The FCM testified that the Children deserved permanency and to have "[a] clean home, clean clothes, always have dinner, [and] always be loved." *Tr.* at 158. Additionally, both the CASA and the FCM testified that they believed that termination of the Parents' parental rights was in the Children's best interest. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interest of the Children.

[24] We will reverse a termination of parental rights "only upon a showing of 'clear error'-- that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Parents' parental rights to the Children was clearly erroneous. We therefore affirm the juvenile court's judgment.

[25] Affirmed.

Najam, J., and Barnes, J., concur.